IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CITY OF LEE'S SUMMIT, MISSOURI, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:25-cv-00317-RK |
| JACKSON COUNTY, MISSOURI, | ) |
| Defendant. | ) |

# ORDER

The City of Lee's Summit, Missouri, plans to expand and improve an existing intersection located within its city limits. While it has reached agreements with some of the impacted landowners, it has not reached an agreement with one in particular—Jackson County, Missouri. As a result, the City seeks to assert its municipal power of eminent domain to acquire the County's real property and various non-exclusive easements (including roadway and utility easements) for the planned intersection project. The City accordingly filed an eminent domain action against the County in the Circuit Court of Jackson County, Missouri.

The County's real property at issue in the City's eminent domain action is not only land owned by the County, but it also encompasses a railroad right-of-way, part of the (former) Rock Island Rail Corridor. Railroad rights-of-way, including the one at issue here, are regulated by the federal government through the U.S. Surface and Transportation Board ("STB"). The County, as authorized by the STB and federal law, currently uses the subject railroad right-of-way as part of its recreational trail, the Rock Island Trail, through a practice known as "railbanking." The City's planned intersection project would expand existing roadways and construct new roadways, including related utilities infrastructure, both in and around the subject right-of-way. To accommodate its new and expanded intersection, the City plans to relocate the subject portion of the County's Rock Island Trail to outside rail corridor and intends to grant the County use of a trail easement to be acquired by the City at the same time to maintain continuity of the County's trail.

After the City filed its eminent domain action in the state circuit court, the County removed the case to federal court, invoking the Court's original federal question subject-matter jurisdiction under 28 U.S.C. § 1331. Now before the Court are two motions: (1) the County's motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim, (Doc. 6); and (2) the

City's motion to remand, (Doc. 14). Both motions are fully briefed. (Docs. 7, 13, 15, 18, 24.) After careful consideration and review, and for the reasons set out below, the Court **ORDERS** that (1) the City's motion to remand, (Doc. 14), is **GRANTED**; (2) the City's request for attorney fees under 28 U.S.C. § 1447(c) is **DENIED**; and (3) the County's motion to dismiss, (Doc. 6), is **DENIED as moot**. The Court **FURTHER ORDERS** that this case is **REMANDED** to the Circuit Court of Jackson County, Missouri.

## Background

I. **Federal Railroad Industry Regulation and the National Trails System**

The federal government has long regulated the railroad industry. *See R.J. Corman R.R. Co./Memphis Line v. Palmore*, 999 F.2d 149, 151-53 (6th Cir. 1993) (discussing the history of federal regulation of the railroad industry which has been "[v]iewed as a 'state within a state'" (citation omitted)). The federal government historically regulated railroads (among other transportation industries) through the Interstate Commerce Commission. Congress abolished the Interstate Commerce Commission in 1995, however, and established in its place the Surface Transportation Board, vesting the STB with "exclusive" jurisdiction over certain matters involving railroads. ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803 (Dec. 29, 1995); *see* 49 U.S.C. § 10501(b). Specifically, Congress established that the STB has "exclusive" jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State[.] . . .

§ 10501(b). Congress further established that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.*

In 1968, Congress first established a national system of trails to promote outdoor recreation. *See* National Trails System Act, Pub. L. 90-543, 82 Stat. 919, codified at 16 U.S.C. § 1241 *et seq.* [hereinafter "Trails Act"]. Fifteen years later, in 1983, Congress amended the Trails Act to authorize "interim use of any established railroad rights-of-way . . . in a manner consistent with the National Trails System Act . . . ." National Trails System Act Amendments of 1983, Pub. L. 98-11, § 208, 97 Stat. 42, 16 U.S.C. § 1247(d). In permitting interim trail use of railroad

2

corridors, Congress specified that the interim trail use is both "subject to restoration or reconstruction for railroad purposes" and will "*not* be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." Pub. L. 98-11, § 208(2), 97 Stat. 42, 16 U.S.C. § 1247(d). In doing so, Congress crafted an alternative to the full discontinuance and abandonment of a railroad line. A full discontinuance and abandonment results in the simultaneous dissolution of the federal interest and regulatory authority and the application of state law to, *inter alia*, establish the proper reversionary or controlling property interest as to the underlying real property. *See Glosemeyer v. Missouri-Kansas-Texas R.R.*, 879 F.2d 316, 318 (8th Cir. 1989) (recognizing that "much railroad right-of-way is held by easement only and, under the laws of some states, once rail service is discontinued such easements automatically expire and the rights-of-way revert to adjacent property owners"). The alternative that Congress crafted is referred to as "railbanking," which allows inactive railroad corridors to be preserved for future rail use rather than being abandoned. Section 1247(d) specifies:

> [if] a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board [1] shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and [2] shall not permit abandonment or discontinuance [of the right-of-way by a rail carrier that is] inconsistent or disruptive of such use.

*Id.* (brackets and emphasis added).

Thus, the full federal regulatory scheme involving railroads and railroad rights-of-way encompasses and simultaneously maintains two federal purposes and interests through railbanking: "to preserve established railroad rights-of-way for future reactivation of rail service and to assist recreational users by providing opportunities for trail use on an interim basis." *Trevarton v. South Dakota*, 817 F.3d 1081, 1085 (8th Cir. 2016) (quotation modified); *see Fletcher v. Burlington N. & Santa Fe Ry. Co.*, 474 F.3d 1121, 1123 (8th Cir. 2007) (recognizing that railbanking under the Trails Act serves "as an alternative to complete abandonment of a rail line right of way" and preserves the "unused railroad rights of way for future rail service by temporarily converting the rights of way into recreational trails until they are again needed for fail purposes").

## II. The County's Rock Island Trail

In 2015, the County engaged in administrative and regulatory proceedings with the STB to acquire 17.7 miles of rail line, part of the Rock Island Line, then-owned and operated by the Union

3

Pacific Railroad Company, under which Jackson County d/b/a Rock Island Rail Corridor Authority would be the railroad operator on the line. *Jackson County, Mo.—Acquisition & Operation Exemption—Union Pac. R.R. Co.*, No. FD 35982 [hereinafter, "*STB Acquisition Proceedings*"], 2015 WL 9672626 (STB Dec. 30, 2015). The County initiated these proceedings on the premise that it intended to acquire and operate the subject portion of the Rock Island Line as "a Class III carrier."[1] *STB Acquisition Proceedings*, 2016 WL 270954, at *1 (STB Jan. 21, 2016). The STB granted regulatory authorization for the County to acquire and operate the Rock Island Line on February 4, 2016. *STB Acquisition Proceedings*, 2016 WL 454035 (STB Feb. 4, 2016).

Three years later, however, the STB revoked its prior 2016 acquisition and operation authorization. *STB Acquisition Proceedings*, 2019 WL 3493987 (STB July 30, 2019). In a challenge to the authorization brought by nearby landowners, the STB found that the County's removing railroad track and placing a trail directly on the railbed in its place was "contrary to the acquisition [and operation] of a rail line." *Id.* at *1. The STB ruled that "[i]f the County intends to remove the track and place a trail on the rail bed, then the County should do so by the [STB]'s interim trail use/railbanking procedures under the Trails Act [as amended]." *Id.*

Almost three months after the STB's revocation order, Union Pacific and the County jointly instituted separate administrative and regulatory proceedings to abandon the rail line and indicated their intent "to enter into an interim trail use/rail banking agreement pursuant to the National Trails System Act[.]" *Union Pac. R.R. Co. & Jackson County, Mo.—Abandonment Exemption—in Jackson County, Mo.*, No. AB 33 (Sub-No. 342X) [hereinafter, "*STB Interim Trail Use Proceedings*"], 2019 WL 5486188, at *1 (STB Oct. 18, 2019). On January 17, 2020, the STB authorized the County's interim trail use of the railroad right-of-way and granted a Notice of Interim Trail Use ("NITU") under the Trails Act as amended and applicable STB regulations. *STB Interim Trail Use Proceedings*, 2020 WL 359401 (STB Jan. 17, 2020) [hereinafter "STB's 2020 NITU"].

The STB's 2020 NITU expressly included the following condition: "Use of the right-of-way for trail purposes is subject to possible future reconstruction and reactivation of the right-of-

---

[1] STB regulations define three classes of carriers—Class I, Class II, and Class III—which classification is principally determined by annual adjusted carrier operating revenues. 49 C.F.R. § 1201.1-1(b)(1). A Class III carrier is one that has $40.4 million or less in annual adjusted carrier operating revenues. § 1201-1(a).

way for rail service and to the trail sponsor's [i.e., the County's] continuing to meet its responsibilities for the right-of-way." *Id.* at *6. The NITU also included as follows:

> 2. If an interim trail use/rail banking agreement is reached, it must require the trail sponsor to assume, for the term of the agreement, full responsibility for: (i) managing the right-of-way; (ii) any legal liability arising out of the transfer or use of the right-of-way (unless the sponsor is immune from liability, in which case it need only indemnify the railroad against any potential liability); and (iii) the payment of any and all taxes that may be levied or assessed against the right-of-way.
>
> 3. Interim trail use/rail banking is subject to possible future reconstruction and reactivation of the right-of-way for rail service and to the trail sponsor's continuing to meet its responsibilities for the right-of-way . . . .
>
> 4. If an interim trail use/rail banking agreement is reached (and thus, interim trail use/rail banking is established), the parties shall jointly notify the Board within 10 days that an agreement has been reached. . . .
>
> 5. If interim trail use/rail banking is implemented, and subsequently the trail sponsor intends to terminate trail use on all or any portion of the right-of-way covered by the interim trail use/rail banking agreement, it must send the Board a copy of this decision and notice and request that it be vacated on a specified date.
>
> 6. If an agreement for interim trail use/rail banking is reached by July 19, 2020, for the portion of the right-of-way subject to the NITU, interim trail use/rail banking may be implemented. If no agreement is reached, the Line may be fully abandoned, subject to any outstanding conditions.
>
> . . .
>
> 9. . . . Petitioners [Union Pacific Railroad Company and the County] shall file a notice of consummation with the Board to signify that they have exercised the authority granted and fully abandoned the Line. If consummation has not been effected by Petitioners' filing of a notice of consummation by January 21, 2021, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. If a legal or regulatory barrier to consummation exists at the end of the one-year period, the notice of consummation must be filed no later than 60 days after the satisfaction, expiration, or removal of the legal or regulatory barrier.

*Id.* at *6-7.

The following month, Union Pacific and the County subsequently entered into a Trail Use Agreement for the County's interim use of the railway right-of-way as a recreational trail. (Doc. 7-2.) In the agreement, the County "acknowledge[d] that the use of the Line is subject to the County's continuing to meet its responsibilities . . . and subject to possible reconstruction and reactivation of the Line for rail service." (*Id.* at 5.)

5

### III. The City's Planned Intersection Project and Eminent Domain Action

Most recently, in 2025, the City Council for the City of Lee's Summit, Missouri, passed Ordinance No. 10078 authorizing city officials to take action to secure or acquire certain real estate for its "Ward Road and Persels Road Intersection Project," an intersection expansion project for which local voters had previously approved funding. (Doc. 1-1 at 50.) The City intends to construct, expand, and relocate roadway, water, storm water, utilities, and pedestrian amenities as part of the improvement project. (Doc. 1-1 at 4, ¶ 6.) The City has acquired 17 parcels of land so that it can complete its planned improvement project; the only property owner it has been unable to reach an agreement with is the County. (*Id.* at 7, ¶ 14.)

Accordingly, the City filed a petition for eminent domain under state law to condemn the county-owned real property to pursue its planned intersection project, which includes a portion of the 17.7-mile railroad right-of-way currently being used by the County as part of the Rock Island Trail pursuant to the Trail Use Agreement with Union Pacific and as authorized by the STB's 2020 NITU. (*Id.* at 8, ¶¶ 22, 24.) The City intends to "realign" the County's Rock Island Trail and to "reconstruct[] it in a safer location" outside the railroad right-of-way. (*Id.* at ¶ 25.) Although it appears that the intersection improvement project will directly involve the railroad right-of-way, (*see* Doc. 1-1 at 58-59), the City alleges that the intersection project "will be consistent with the current grade of [the County]'s parcel to maintain the continuity of the Rock Island Corridor for future transit use." (*Id.* at 9, ¶ 29).

### Discussion

The two motions before the Court—the City's motion to remand and the County's motion to dismiss—each ostensibly raise challenges to the Court's "jurisdiction" to proceed in this case. The City's motion to remand challenges the County's removal of the state-law eminent domain action from state court to federal court—it raises a question of whether the Court has original subject-matter jurisdiction. Whether the Court has original subject-matter jurisdiction is a threshold issue and asks whether the door to the federal court is open for the County to properly invoke the federal removal statute. In removing the case to federal court, the County relies on federal question to support this Court's original subject-matter jurisdiction under 28 U.S.C. § 1331.[2]

---

[2] The County does not invoke the Court's original jurisdiction for diversity-of-citizenship under 28 U.S.C. § 1332 (nor could it since the City and the County are both political subdivisions within the State of

6

After removing the case, the County now moves to dismiss based on the "preemption doctrine." The County's motion to dismiss raises the question of whether the Court has jurisdiction to consider the merits of the City's eminent domain action (or whether the STB has primary or exclusive authority here). The County argues that the Court lacks jurisdiction because the planned intersection project is "expressly" preempted by the ICC Termination Act and controlling federal regulatory authority over the railbanked railroad right-of-way. And more so, the County argues that the STB has exclusive jurisdiction under the ICC Termination Act (49 U.S.C. § 10501(b)) to decide the preemption issue in the first instance. Rather than raising a threshold original subject-matter jurisdiction issue, however, the County's motion to dismiss raises the merits-facing jurisdictional issue of ordinary preemption.[3]

Because the Court finds that it does not have original federal question subject-matter jurisdiction—the threshold jurisdictional issue raised by the City's motion to remand—the Court begins and ends there. Original subject-matter jurisdiction is the first question in every case, and in a removed case, if the court concludes that it lacks original subject-matter jurisdiction it must proceed no further. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.") Accordingly, the Court does not (and cannot) reach or decide the merits-facing questions raised in the County's motion to dismiss, including the County's argument that the City's state-law eminent domain action is preempted by federal law. The County argues that this is a question solely within the exclusive statutory jurisdiction and authority of the STB to decide. The Court, as set forth below, finds this argument to be an affirmative defense and therefore not a sufficient basis for federal question and removal jurisdiction.

### I. Plaintiff's Motion to Remand

Unlike state courts which have general subject-matter jurisdiction, federal courts have limited original subject-matter jurisdiction. The original subject-matter jurisdiction of federal

---

Missouri).

[3] The ordinary preemption issue fundamentally turns on whether the project would interfere with or impede future possible future railroad use. *See City of N. Little Rock v. Union Pac. R.R. Co.*, 808 F. Supp. 2d 1102 (E.D. Ark. 2011); *Maumee & Western Railroad Corporation and RMW Ventures, LLC— Petition for Declaratory Order*, STB No. 34354, 2004 WL 395835 (STB Mar. 2, 2004). The ordinary preemption issue here does not turn on the issue of abandonment because as a matter of law, the railroad right-of-way has *not* been abandoned.

7

courts is established through the specific grant of jurisdiction under Article III of the U.S. Constitution and federal statutes, 28 U.S.C. §§ 1331 and 1332. *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). The limited jurisdiction of federal courts can overlap with the general jurisdiction of state courts. When a case is properly filed in state court and a federal court would also have original federal subject-matter jurisdiction—whether because a claim in the lawsuit "arise[s] under" federal law (28 U.S.C. § 1331) or because there is diversity of citizenship among the parties (28 U.S.C. § 1332)—the case may be removed to federal court. 28 U.S.C. § 1441(a). As noted above, in this case the County invokes the Court's original subject-matter jurisdiction established under § 1331, referred to as federal question jurisdiction. (Doc. 1.)

### A. Original Federal Question Jurisdiction and the "Well-Pleaded Complaint" Rule

Title 28 U.S.C. § 1331 establishes that federal courts have original jurisdiction as to "all civil actions arising under the Constitution, laws, or treaties of the United States." Federal question jurisdiction generally "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Minn. ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 709 (8th Cir. 2023). This is referred to as the "well-pleaded complaint" rule. As a practical matter, the well-pleaded complaint rule allows a plaintiff to "avoid federal jurisdiction by exclusive[ly] rel[ying] on state law" in asserting its claims for relief. *Id.* When a plaintiff seeks relief and asserts a cause of action solely relying on state law, there is not generally original federal question subject-matter jurisdiction under § 1331. And more so, it is well established that under the well-pleaded complaint rule, "the potential applicability of a *defense arising under federal law* doesn't create [original federal] jurisdiction." *Id.* (emphasis added); *see Wullschleger*, 604 U.S. at 26.

At the same time, however, it is also true that a plaintiff "may not defeat removal by omitting to plead necessary federal questions" in the complaint. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 22 (1983). In this vein, the Eighth Circuit has recognized two exceptions to the well-pleaded complaint rule. The first is when the state-law claims asserted in the lawsuit are "completely preempted by federal law." *Minn. ex rel. Ellison*, 63 F.4th at 709. The second is when the state-law claims asserted in the lawsuit "necessarily raise a substantial, disputed federal question." *Id.* The County invokes both exceptions to the well-pleaded complaint rule to establish original federal jurisdiction to support its removal of the City's state-law eminent domain action to federal court.

## B. Exception No. 1 – The Doctrine of Complete Preemption

The first exception to the well-pleaded complaint rule is the doctrine of complete preemption.[4] The doctrine of complete preemption holds that a federal court has original federal question jurisdiction even when a complaint ostensibly asserts a cause of action and seeks relief solely under state law when "a federal statute 'so completely pre-empts a particular area that any civil complaint raising this select group of claims is necessarily federal.'" *Shroeder v. Spire, Inc.*, No. 4:19-CV-00623-DGK, 2020 WL 1505570, at *2 (W.D. Mo. Mar. 30, 2020) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)) (quotation modified). As the Eighth Circuit has explained, "[a] conclusion that there is complete preemption [as an exception to the well-pleaded complaint rule] effectively maintains that the plaintiff has simply brought a mislabeled federal claim, which may be asserted under some federal statute." *Johnson v. MFA Petroleoum Co.*, 701 F.3d 243, 247 (8th Cir. 2012) (internal quotation marks omitted). Indeed, the "touchstone" of the complete preemption analysis is "congressional intent," that is whether Congress "intended that the federal statute provide the exclusive cause of action for the asserted [state-law] claim." *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 785 F.3d 1182, 1189 (8th Cir. 2015). The doctrine

---

[4] "Complete preemption" is a legal term of art and is distinct from "ordinary preemption." "Complete preemption" is triggered only when federal law provides the exclusive cause of action and remedy for a particular harm. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003) (finding that the National Bank Act completely preempts usury claims against national banks, recognizing that the relevant statutory provisions "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant . . . relies entirely on state law"). "Ordinary preemption" arises out of the Supremacy Clause to the U.S. Constitution. It is a defense and does not alone establish original subject-matter jurisdiction. *Id.* at 13 (Scalia, J., dissenting) ("By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. A case may *not* be removed to federal court on the basis of the defense of pre-emption. To be sure, pre-emption requires a state court to *dismiss* a particular claim that is filed under state law, but it does not, as a general matter, provide grounds for *removal*." (citations and internal quotation marks omitted) (quotation modified)). The Court is not confident that the County fully appreciates the difference between these two concepts. The County discusses "categorical preemption," "per se preemption," "express preemption," "as-applied preemption," "field preemption," "implied preemption," and "conflict preemption" in its submissions. (Doc. 7 at 7, 13, 17; Doc. 18 at 7.) These refer to "ordinary preemption" and do not address "complete preemption" which focuses on whether federal law provides the exclusive cause of action and remedy for the plaintiff's claim.

Recognizing these two concepts as separate is important as well when discussing the Court's "jurisdiction." The City's motion to remand focuses on the Court's original subject-matter jurisdiction and more specifically, federal question "arising under" jurisdiction established by 28 U.S.C. § 1331. While ordinary preemption is also "jurisdictional," *see Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1070 (8th Cir. 2021), it is not "jurisdictional" in the sense of supporting original federal question jurisdiction as a basis for removal to federal court, *id.*

of complete preemption is to be narrowly and cautiously applied. *See Johnson*, 701 F.3d at 247 (recognizing that "[f]or a statute to provide federal question jurisdiction under this exception, [the statute] must have extraordinary pre-emptive power, a conclusion courts are reluctant to reach") (internal quotation marks omitted); *Griffioen*, 785 F.3d at 1191 (recognizing as "unlikely that Congress would intend to completely preempt state-law causes of action without providing a federal cause of action," and thus "without a federal cause of action which in effect replaces a state law claim, there is an exceptionally strong presumption against complete preemption").

In *Griffioen*, the Eighth Circuit specifically considered the doctrine of complete preemption and the ICC Termination Act. In that case, the plaintiffs asserted a class action complaint under Iowa state law seeking damages against Union Pacific Railway Co. and Union Pacific Corporation (collectively, "Union Pacific"), among other defendants, for negligence and strict liability. 785 F.3d at 1185. The putative class action alleged specifically that, *inter alia*, Union Pacific failed to properly build and maintain certain railway bridges over the Cedar River which caused or exacerbated property damage when the river flooded. *Id.* Union Pacific removed the putative class action from state court to federal court, ultimately relying on the complete preemption of the ICC Termination Act to establish federal question jurisdiction and overcome the well-pleaded complaint rule. *Id.* The district court agreed that it had federal removal jurisdiction under the complete preemption doctrine with the ICC Termination Act *See id.* at 1186. On appeal, the Eighth Circuit disagreed and found that remand was required for lack of federal subject-matter jurisdiction.

To be sure, the Eighth Circuit recognized in *Griffioen* that the ICC Termination Act does completely preempt *some* state-law claims. *Id.* at 1189-90 (finding that the plain language, purposes, and legislative history of the express preemption provision all supported a conclusion that Congress intended to completely preempt "certain state-law claims"). The Court of Appeals recognized the "powerful" language within the express preemption provision of the statute (i.e., § 10501(b)) that "clearl[y] indicat[es]" Congress' "preemptive intent with respect to the matters set forth therein [i.e., § 10501(b)(1)-(2)]." *Id.* at 1189. Even so, because the express preemption provision "does not address removal or explicitly provide for federal question jurisdiction over all preempted state-law claims," original federal subject-matter jurisdiction exists under the complete preemption exception to the well-pleaded complaint rule only as to those state-law claims that "fall within the scope of the [ICC Termination Act]'s complete preemption." *Id.* at 1190.

10

To determine the scope of the ICC Termination Act's complete preemption, the Eighth Circuit in *Griffioen* looked beyond the express preemption provision codified at § 10501(b) to consider whether the ICC Termination Act provides any "substitute cause of action" for the claims asserted by the plaintiffs. *Id.* at 1191. The Court concluded it did not. The Eighth Circuit recognized that "[t]he primary focus of the [ICC Termination Act]'s substantive provisions is regulation of competition, rates, licensing, finance, and the economic relationships between shippers and carriers," and found that the "allegations that [Union Pacific]'s bridge maintenance and related conduct resulted in flooding of real property . . . does not fall within the scope of this substantive framework." *Id.* Thus, the Eighth Circuit held that there was no original federal question jurisdiction under the complete preemption doctrine. Specifically, it held that although "the [ICC Termination Act] may completely preempt some claims," Union Pacific "has not established that the [putative class action]'s claims fall within the scope of those so preempted," and remand was therefore required. *Id.* at 1192.

Here, the County relies primarily on the broad language of the express preemption provision codified at 49 U.S.C. § 10501(b) as supporting original federal question subject-matter jurisdiction in this case. The County's argument that the City's planned intersection project would amount to a "de facto abandonment" of the railroad right of way because it would 'interfere with or impede [possible future] railroad operations,"[5] improperly "conflate[s] complete and ordinary preemption," however. *Griffioen*, 785 F.3d at 1190; *see also Lehmann v. Brown*, 230 F.3d 916, 919, 920 (7th Cir. 2000) (recognizing that "the phrase 'complete preemption' has caused confusion" and "is a misnomer, having nothing to do with preemption and everything to do with federal occupation of a field," in that "[s]tate law is 'completely preempted' in the sense that it has been replaced by federal law—but this happens because federal law takes over all similar claims, not because there is a preemption defense"). At base, "[o]rdinary preemption is a federal defense that exists where a federal law has superseded a state law claim." *Johnson*, 701 F.3d at 248. Grounded in the Supremacy Clause, ordinary preemption "simply declares the primary of federal law, regardless of the forum or the claim." *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005). In

---

[5] And thus, as the County argues, implicates the broad "exclusive jurisdiction" of the STB "over the acquisition and operation of railroad right[s]-of-way." As indicated in note 3, above, however, whether the intersection would interfere with or impeded future possible railroad use is the test for ordinary preemption.

11

this way, although ordinary preemption is informative to the issue of complete preemption, "[c]omplete and ordinary preemption are not necessarily coextensive." *Griffioen*, 785 F.3d at 1190; *see Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398 (1987) ("The fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted . . . does not establish that they are removable to federal court.")

The County's argument for complete preemption is in reality nothing more than an ordinary-preemption argument.[6] The County points to no "federal cause of action" arising under the ICC Termination Act that replaces or supplants the City's eminent-domain action. Even if the County's invocation of "abandonment" or "de facto abandonment" issues were separate from its ordinary preemption defense, the Court would not be persuaded that the statutory abandonment process under 49 U.S.C. § 10903 satisfies the complete preemption doctrine to establish original federal question subject-matter jurisdiction in this case.

There is a somewhat open question of statutory interpretation whether under the ICC Termination Act third parties (or only a "rail carrier") may institute an abandonment proceeding with the STB. *See Ill. Dep't of Transp.*, 2024 WL 5007729, at *6 (finding that "a plain reading of the statute" only permits "rail carrier[s], not third parties . . . to apply for abandonment") (citing *City of S. Bend v. STB*, 566 F.3d 1166, 1169-71 (D.C. Cir. 2009) (Kavanaugh, J., concurring)). As the district court in *Illinois Department of Transportation* observed, "[w]ithout a statutory basis to bring a claim for abandonment, it is doubtful that this mechanism is capable of vindicating the same interest that [the City] seeks to vindicate through its condemnation act." *Id.* (citing *Griffioen*, 785 F.3d at 1191). The Court finds this analysis somewhat persuasive. But even if the City *could* seek an adverse abandonment under federal law, the STB's exclusive or primary jurisdiction over such abandonment would "*undermine[]* . . . the complete preemption analysis" in this case. *Id.* (emphasis added); *see Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 806 (7th Cir. 2009) ("the 'sine qua non of complete preemption is a pre-existing *federal* cause of action that can be brought in district courts'") (quoting *Lontz v. Tharp*, 413 F. 3d 435, 442 (4th Cir. 2005)) (emphasis in original).

---

[6] The substantial overlap in the County's arguments opposing the City's motion to remand for lack of original federal question subject-matter jurisdiction (as the threshold jurisdictional issue) and the County's arguments supporting its motion to dismiss for lack of jurisdiction (as a merits-facing jurisdictional issue) makes this point clear.

In short, much like Union Pacific in *Griffioen*, the County here does not identify any federal cause of action within the substantive scope or framework of the ICC Termination Act (or even within the associated regulatory scheme) to overcome the "exceptionally strong presumption against complete preemption." *Griffioen*, 785 F.3d at 1191. The County points to no provision within—or regulation under—the ICC Termination Act through which complete preemption of the City's eminent domain action is effectuated. *See id.* at 1190 (recognizing that "[t]he exclusive, federal cause of action is the hinge on which the door to the federal courthouse swings") (internal quotation marks omitted).

To be sure, the County has somewhat persuasively argued that the City's eminent domain action may well be preempted by federal regulation of the railroad right-of-way in the sense of ordinary preemption arising under the Supremacy Clause. The City's intersection project appears to encroach much more upon and to potentially impact the future usability of the railroad right-of-way than a simple routine at-grade railroad crossing. It may also be as well that under § 10501(b), the STB has exclusive jurisdiction to make this determination. But the County's argument that the STB has exclusive jurisdiction over "claims arising under the [ICC Termination Act]'s substantive provisions" by virtue of § 10501(b)—including abandonment—simply does not itself satisfy the threshold issue of establishing *original federal question subject-matter jurisdiction* required to remove this case from state to federal court. *Id.*

### C. Exception No. 2 – Substantial, Disputed Federal Question Necessarily Raised

Under the second exception to the well-pleaded complaint rule, original federal question jurisdiction is established if the "state-law claim necessarily raises a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial authorities." *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn. LLC*, 843 F.3d 325, 331 (8th Cir. 2016) (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)) (quotation modified); *see Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (recognizing that "[f]ederal jurisdiction may be found from a complaint if adjudication of a state claim would turn on a federal constitutional or other important federal question, even where only state law issues have been plead).

Under this doctrine, however, the federal issue implicated in the case must be "a *necessary* element of one of the well-pleaded state-law claims in the plaintiff's complaint." *Minn. ex rel.*

13

*Ellison*, 63 F.4th at 711 (internal quotation marks omitted). This inquiry is a "precis[e]" one and requires that the County (as the removing defendant) "point to the specific elements of the plaintiff's state law claims that require proof under federal law." *Id.* (internal quotation marks omitted). Here, the County does not explain how any federal issue—including that the City's condemnation would be a "*de facto* abandonment" of the railroad right-of-way or the County's interim trail use under the Trails Act—is a necessary element to the City's state-law eminent domain petition. The Count's "*de facto* abandonment" argument is merely a re-framing and re-purposing of its ordinary preemption argument in an attempt to establish original federal question subject-matter jurisdiction.[7]

As to the Trails Act issue, the County appears to argue that the City's eminent domain action necessarily raises a substantial and disputed federal issue because it is essentially a collateral attack on the STB's 2020 NITU.[8] In *Grantwood Village v. Missouri Pacific Railroad Co.*, 95 F.3d 654 (8th Cir. 1996), the Eighth Circuit held that federal removal jurisdiction was properly exercised where the plaintiff's quiet title action "necessarily involves federal law."[9]

---

[7] Putting aside that "abandonment" and "de facto abandonment" are terms of art, the County's argument in this regard makes clear that what the County is referring to is really nothing more than its argument that the City's eminent domain action is preempted as a matter of ordinary preemption principles. Moreover, on its face, this argument focuses on *the effect* of the City's proposed condemnation and in this way does not raise a federal issue that is necessarily implicated by the City's eminent domain action in the relevant sense (i.e., that it is a necessary element of the well-pleaded state-law claim set forth by the City, rather than a defense).

[8] Although the County does not appear to rely on the Trails Act itself or suggest that the Trails Act raises any preemption defense similar to the ICC Termination Act, the Court notes that the Eighth Circuit has held that the Trails Act does not confer any similar "exclusive jurisdiction" on the STB such as "regulating how the trail operator [or interim trail user] will manage a trail," and instead "the STB's jurisdiction to regulate or manage a former railroad right-of-way during its interim use as a trail is shared with numerous other federal departments and agencies, and with the States to the extent state regulation of trails is not federally preempted." *Trevarton*, 817 F.3d at 1086. Here, the only basis for federal preemption of state regulation of the trails appears to emanate from the simple fact that the railbanked trails remain under the exclusive jurisdiction of the STB as a non-abandoned railroad right-of-way rather than some other federal preemption arising under the Trails Act, for example.

[9] The Eighth Circuit in *Grantwood Village* did not discuss "complete preemption." As best as the Court can discern, *Grantwood Village* is best understood as considering original federal question subject-matter jurisdiction when a plaintiff's "right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. of State of Cal. v. Constr. Labor. Vac. Tr. for S. Cal.*, 463 U.S. 1, 13 (1983). Moreover, the Eighth Circuit's opinion in *Grantwood* predates the Supreme Court's refinement of the complete preemption doctrine in *Beneficial National Bank*.

In that case, a third-party entity, Trailnet, sought to use part of a railroad line then-owned by the Missouri Pacific Railroad as a trail. Trailnet obtained a Notice of Interim Trail Use or Abandonment from the ICC and engaged in negotiations with Missouri Pacific Railroad to secure its interim trail use of the railroad, ultimately obtaining a quitclaim deed. *See id.* at 656. Grantwood Village, a town with lots adjacent to the real property on which the railroad right-of-way was located, filed a quiet title action in Missouri state court against Missouri Pacific and Trailnet seeking a declaratory judgment that it was the fee simple absolute owner of the real property containing the railroad right-of-way and seeking the ejectment of Trailnet, among others. *Id.* at 656-57.

After Trailnet removed the case to federal court, the district court denied Grantwood Village's motion to remand. *Id.* at 657. On cross-motions for summary judgment, the district court ultimately found that Pacific Railroad Company (Missouri Pacific's predecessor-in-interest) had acquired a valid easement to the real property by estoppel, which easement had passed to Missouri Pacific and then to Trailnet. *Id.* The district court rejected Grantwood Village's "contention that any right held by [Missouri Pacific] had been abandoned . . . holding that the ICC retained jurisdiction over the right-of-way by authorizing interim trail use and that federal law preempts state law on the question of abandonment." *Id.*

On appeal, the Eighth Circuit agreed that removal of the state-law quiet title action to federal court was proper. Specifically, the Court of Appeals reasoned that the state-law action was "in essence a collateral attack on the ICC's order authorizing interim trail use on the right-of-way" because "a challenge to Trailnet's interest in the right-of-way necessarily includes a review of the ICC's Decision [authorizing interim trail use on the right-of-way]." *Id.* This was because Trailnet received its interest "pursuant to a quitclaim deed and Agreement executed in compliance with the ICC's Decision and NITU." *Id.* The Eighth Circuit further reasoned that "the Village's attempt to prevent the preservation of the railroad right-of-way necessarily entails a finding that [Missouri Pacific Railroad] abandoned the right-of-way at some point in time," and that "[b]ecause the ICC has exclusive and plenary authority to determine whether a rail line has been abandoned, the question of whether [Missouri Pacific Railroad] abandoned the right-of-way necessarily involves federal law." *Id.*

The City argues that *Grantwood Village* is distinguishable because this case does not involve the abandonment of a railroad right-of-way. The Court largely agrees. No party argues

15

that the railroad right-of-way has been abandoned. As a matter of law, under the STB's 2020 NITU and the County's Trail Use Agreement with Union Pacific, the railroad right-of-way has *not* been abandoned. *See* 16 U.S.C. § 1247(d). And as explained above, the County's "*de facto* abandonment" argument is best understood (as it is presented) as simply re-framing and re-purposing its ordinary preemption defense to attempt to establish original federal jurisdiction where none exists. At most, the "federal issue" in this case is whether the City's planned intersection project is inconsistent with potential future railroad use; i.e., the ordinary preemption issue. But this issue is not "necessarily raised" by the City's eminent domain action in the relevant sense.

Unlike the quiet title action in *Grantwood Village*, the City's eminent domain action in this case does not represent an indirect collateral attack on the STB's 2020 NITU. The reason why is because of the nature of the very different causes of action asserted in each case—a quiet title action asserted in *Grantwood Village* and an eminent domain action (pursuant to statutory authority) asserted by the City here. The town's quiet title action in *Grantwood Village* turned on the issue of abandonment of the railroad right-of-way because the town could prove it had superior title *only if* the railroad right-of-way had been abandoned (in which case it would have become the fee simple owner of the real property by operation of state law). *See also Ollison v. Vill. of Climax Springs*, 916 S.W.2d 198, 203 (Mo. banc 1996) (recognizing that in an action for quiet title a party seeks to prove "title superior to the other party"). Accordingly, the ICC's authorization of interim trail use in that case was itself directly implicated because it had a direct legal effect on whether the railroad right-of-way had been abandoned under federal law and property rights vested (under state law) in the village.

Here, in contrast, the City's eminent domain action does not similarly challenge (or require any finding or adjudication) of the County's legal interests. *See State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 475 (Mo. banc 2013) ("Eminent domain is the power of the State to take private property and 'is an inherent element of sovereignty.'" (quoting *St. Louis, H. & K.C. Ry. Co. v. Hannibal Union Depot Co.*, 28 S.W. 483, 485 (1894) (Mo. Div. 1)). In other words, the City's condemnation of the County's property, including the railroad right-of-way for which the County is an authorized interim trail user, does not require a finding that the railroad right-of-way has been abandoned or does not implicate or require resolution of the County's legal property interests

16

whether as property owner or interim trail user.[10] *Grantwood Village* is therefore distinguishable and does not control the outcome in this case.[11]

Ultimately, for these reasons, the County has not demonstrated that this second exception to the well-pleaded complaint rule applies in this case to establish original federal question jurisdiction supporting federal removal jurisdiction, either.

### D. Conclusion

Throughout its Notice of Removal and opposition brief to the City's motion to remand, the County simply attempts to repurpose or to re-frame in various ways the legal question of ordinary preemption, which the City expressly acknowledges is implicated in this case because its intended condemnation involves a non-abandoned railroad right-of-way that continues to be regulated by and falls under the authority of the STB. The issue of ordinary preemption is a defense, however, and does not overcome the well-pleaded complaint rule whether through the doctrine of complete

---

[10] The County cites *Grantwood Village* as recognizing that "[c]omplaints originally filed in state court opposing, either directly or indirectly, the continued use of a railroad right-of-way under the Trails Act are routinely removed to federal court, even though the district court goes on to hold that it lacks jurisdiction to review an ICC Order." 95 F.3d at 657 n.4. The Eighth Circuit cited two cases in support of this proposition, each of which also involved quiet title actions in which the plaintiffs argued that the railroad rights-of-way had been abandoned notwithstanding the Trails Act. *See Schneider v. Union Pac. R. Co.*, 864 F. Supp. 120 (D. Neb. 1994); *Victor Oolitic Stone Co. v. CSX Transp., Inc.*, 852 F. Supp. 721 (S.D. Ind. 1994). In addition, the point of *Grantwood* (and the supporting authority of *Schneider* and *Victor Oolitic Stone*) is that under the Hobbs Act only the federal circuit court of appeals has jurisdiction to consider a challenge to an ICC (now STB) order. This "jurisdictional" issue is separate from the primary original federal question subject-matter jurisdiction issue in this case. *See Grantwood*, 95 F.3d at 657-58 (discussing the Hobbs Act jurisdictional issue as "a separate question" from whether the district court had "general subject matter jurisdiction under 28 U.S.C. § 1331" and correspondingly whether removal to federal court was proper and supported).

[11] The County's reliance on another case, *Groh v. Union Pacific Railroad Co.*, No. 17-00741-CV-W-ODS, 2017 WL 5985572 (W.D. Mo. Dec. 1, 2017), is misplaced for the same reasons. That case also involved a quiet title action (in addition to claims for inverse condemnation and trespass) brought by property owners adjacent to the Rock Island Trail. *Id.* at *1. In *Groh*, consistent with *Grantwood*, the district court found that "[t]o rule for Plaintiffs on its claims in this matter requires determinations as to whether Union Pacific abandoned the right-of-way and whether the STB's decision was valid—both of which necessarily involve federal law," and that the plaintiffs' quiet title claims were really a "collateral[] attack[]" on the "STB's decision to grant an exemption to Jackson County, and authorize Jackson County to use the rail line for recreational purposes." *Id.* at *4.

As explained above, however, the Court is not persuaded that a ruling on the City's petition for eminent domain in this case requires any determination as to whether the subject railroad right-of-way has been abandoned or whether the STB's authorization of the County's interim trail use was valid, and does not represent a collateral attack the STB's NITU in the same manner as the quiet title actions in *Grantwood Village* or *Groh*. A condemnation action and a quiet title action are materially different for purposes of establishing original federal question jurisdiction through an exception to the well-pleaded complaint rule.

17

preemption or the *Grable* exception. In this case, the well-pleaded complaint rule controls. The Court accordingly lacks original federal question subject-matter jurisdiction and remand to state court is required. *See* 28 U.S.C. § 1447(c).

In doing so, the Court emphasizes that it has full faith and confidence that Missouri's state courts (with review potentially and ultimately before the U.S. Supreme Court) will properly and fairly consider the County's ordinary preemption defense arising under the ICC Termination Act to the City's eminent domain action.[12] *See Shupp v. Reading Blue Mountain*, 850 F. Supp. 2d 490, 501 (M.D. Pa. 2012) (consistent with the Eighth Circuit's later opinion in *Griffioen*, recognizing that while § 10501(b) vests jurisdiction over "all matters 'managing or governing rail transportation' . . . in the STB, this language does not vest original jurisdiction in the federal district court for the purpose of removal" and that "state courts are competent to render decisions with regard to the [ordinary] preemption issue"). If the state court determines that the City's eminent domain action is preempted by federal law whether by the ICC Termination Act or otherwise, the case should be dismissed and the parties may raise the matter before the STB. *See City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016) ("When a state or federal court determines that the railroad has made no showing that a remedy allowing use of a particular crossing would unreasonably interfere with rail transportation, then the [state or federal] court may proceed to resolve the crossing dispute applying relevant state law contract, property, or condemnation principles. However, if the [state or federal] court concludes that a proposed crossing easement would unreasonably interfere, then § 10501(b) grants the STB exclusive jurisdiction, and the lawsuit or condemnation proceeding must be dismissed or enjoined for lack of jurisdiction.")[13]

---

[12] The Court observes in this regard that the County itself cites in support of its opposition to remand a decision from the Missouri Supreme Court applying a similar analysis to what would be required for purposes of considering its ordinary preemption defense in this case to a state-law condemnation action involving a railroad right-of-way. *See Kansas City Area Transp. Auth. of Kansas City Area Trans. Dist. v. Ashley*, 555 S.W.2d 9, 10 (Mo. banc 1977) (holding that state-law condemnation proceeding should have been dismissed to the extent "[t]he effect of ATA's condemnation action, if successful, would be that it would take over the entire railroad right of way and bring about a permanent and total cessation of railroad service by appellant-railroad as well as any other railroad over this entire line of track," which railroad "remains under the jurisdiction of the ICC and the legal abandonment of its line of track or discontinuance of service can only be accomplished by order of the ICC").

[13] The context of *Ozark* is important. That case was properly in federal court by virtue of diversity-of-citizenship jurisdiction and thus the Eighth Circuit could consider the merits-facing issue of the STB's exclusive jurisdiction/ordinary preemption defense. *See City of Ozark v. Union Pac. R.R. Co.*, No. 16-1186

## II. The City's Motion for Attorney Fees under 28 U.S.C. § 1447(c)

The federal removal statute authorizes that "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of removal." 28 U.S.C. § 1447(c). As the Supreme Court has held, an award of attorney fees under § 1447(c) upon remand after removal is permissible "only when the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Whether to award attorney fees under § 1447(c) is within the Court's "considerable discretion." *Convent Corp. v. City of N. Little Rock*, 784 F.3d 479, 483 (8th Cir. 2015) (internal quotation marks omitted).

The City seeks attorney fees upon remand in this case, arguing that the County's "sole purpose of removal to federal court [was] to have the federal court dismiss the claims for want of jurisdiction," making the removal "improper." (Doc. 13 at 8 (quoting *Convent Corp.*, 784 F.3d at 483 (itself citing *Baas v. Elliot*, 71 F.R.D. 693 (E.D.N.Y. 1976) and *Johnson v. Smith*, 630 F. Supp. 1, 5 (N.D. Cal. 1986)))).) Initially, the Court notes that the Eighth Circuit in *Convent Corp.* expressly questioned the continued persuasive value of *Baas* and *Johnson* after the Supreme Court's decision in *Martin*. *See Convent Corp.*, 784 F.3d at 484 (noting that *Baas* and *Johnson* were decided before *Martin*).

Nevertheless, the City's argument seeking attorney fees upon remand, like many aspects of the County's arguments in opposing the City's motion to remand, similarly confuses the doctrines of complete preemption and ordinary (defensive) preemption. For example, the City argues that the County lacked an objectively reasonable basis for removal because (1) the County removed the case thus asserting the Court's federal subject-matter jurisdiction, and (2) after removal, argued that the action should be dismissed for lack of subject-matter jurisdiction. But seeking dismissal under ordinary preemption, as a jurisdictional defense, is not the same as seeking dismissal for lack of subject-matter jurisdiction under Article III (i.e., for lack of standing) or 28 U.S.C. §§ 1331/1332 (i.e., for lack of diversity-of-citizenship or federal question jurisdiction).

The Court concludes that for purposes of the City's request for attorney fees under § 1447(c), the County had an objectively reasonable basis for removal; a conclusion that is only

---

(8th Cir.) (Appellant's Br. at p. vii) (Apr. 7, 2016). In this way, *Ozark* concerned *only* ordinary preemption and does not address the jurisdictional question at issue here—complete preemption as an exception to the well-pleaded complaint rule to establish original federal question subject-matter jurisdiction.

bolstered by the City similarly confusing the doctrines of complete preemption and ordinary preemption. Accordingly, the Court declines to award attorney fees under § 1447(c).

## Conclusion

Because the County has not demonstrated that either exception to the well-pleaded complaint rule applies to the City's state-law eminent domain action, the Court lacks subject-matter jurisdiction and remand is required. Accordingly, the Court **ORDERS** that (1) the City's motion to remand, (Doc. 14), is **GRANTED**; (2) the City's request for attorney fees under 28 U.S.C. § 1447(c) is **DENIED**; and (3) the County's motion to dismiss, (Doc. 6), is **DENIED as moot**. The Court **FURTHER ORDERS** that this case is **REMANDED** to the Circuit Court of Jackson County, Missouri.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: February 11, 2026

20

Case 4:25-cv-00317-RK   Document 34   Filed 02/11/26   Page 20 of 20